# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>SAMALINA ALICEA,<br>Defendant. | No. CR15-0080<br>REPORT AND RECOMMENDATION |

On the 13th day of November 2015, this matter came on for hearing on the Motion to Suppress (docket number 17) filed by the Defendant on November 2, 2015. The Government was represented by Assistant United States Attorney Lisa C. Williams. Defendant Samalina Alicea appeared in person and was represented by her attorney, Christopher J. Nathan.

## I. PROCEDURAL HISTORY

On September 15, 2015, Defendant Samalina Alicea was charged by Indictment with possession with intent to distribute heroin (Count 1), possession of a firearm in furtherance of a drug trafficking crime (Count 2), and possession of a firearm and ammunition by a prohibited person (Count 3). Defendant appeared on October 5, and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on December 7.

On November 2, Defendant timely filed the instant motion to suppress. The Government filed its resistance on November 10. On November 23, Defendant appeared and entered a conditional plea of guilty to all three counts, reserving her right to pursue the issues raised in her motion to suppress.

## II. RELEVANT FACTS

Defendant claims her Fourth Amendment rights were violated when her house was searched on January 19, 2015. To place the events of January 19 in context, however, it is necessary to review an incident which occurred on January 7, 2015. At approximately 8:00 p.m. on that date, officers were called to the scene of a shooting in the parking lot of a Walmart in Cedar Rapids. Following an investigation, officers believed Brandon Johnson fired eight shots from the backseat of a vehicle being driven by Defendant Samalina Alicea. Officers were told that Defendant and Johnson are siblings.

On January 19, 2015, officers Bryson Garringer and Brandon Boesenberg of the Cedar Rapids Police Department went to Defendant's home in Cedar Rapids to interview her regarding the shooting. The officers arrived at approximately 9:30 p.m. Both officers testified they observed lights on inside the house, although the testimony was not precise in that regard.[1] The officers walked up the driveway and then over to the front door on a sidewalk leading from the driveway to the front stoop.[2] Garringer walked up three steps to the small landing and knocked on the front door. Boesenberg remained on the sidewalk, standing slightly to one side.

Other than the light observed by the officers when they stopped in front of the residence, there were no signs that anyone was home. No vehicles were visible as officers approached the house. No response was made to Officer Garringer's knock. The officers did not observe any movement inside the house and could not hear any sound, other than dogs barking.

---

[1] Officer Garringer testified "there were lights on" toward the "right-hand side" of the house. Officer Boesenberg testified that when they arrived at the residence, "there was a light on inside."

[2] The front of the house is depicted in photographs introduced as Government's Exhibit 1, pp. 1-2.

2

When no one responded to his knock, Officer Garringer decided to walk around the house on the driveway to see if there was a side door. Garringer testified he did not see a side door, but observed two vehicles parked in the grass behind the house. Before Garringer was able to investigate further, Officer Boesenberg called him back to the front of the house. As Garringer was walking toward the back of the house, Boesenberg approached the window immediately to the left of the front door and, using his flashlight, was able to see marijuana on a bed.[3] When he returned to the front of the house, Garringer looked through the window and confirmed Boesenberg's observations.

As shown on Government's Exhibit 1 (pp. 1-2), there are three abutting windows to the left of the front door and identical windows to the right. We now know there was a bedroom on the left and a livingroom on the right, although that information was not known to the officers until they looked through the window. The record is silent regarding the distance from the ground to the bottom of the windows, but the foundation of the house is approximately even with the top of the stoop (which is three steps up from the sidewalk), and there are approximately 10 courses of siding then leading up to the bottom of the window. I believe a fair estimate would place the bottom of the window approximately five to six feet off the ground. The house is approximately five to six feet back from the sidewalk leading to the front steps. Officer Boesenberg admitted that it was necessary for him to leave the sidewalk and approach the house on the grass in order to view inside the window.[4]

---

[3] The interior of the bedroom, including the condition of the blinds and the marijuana on the bed, are depicted in Government's Exhibit 1, pp. 3-4.

[4] In his search warrant application, Officer Garringer swore that "[t]he shades for the window to the east side of the front door were open and *while standing by the door* Investigator Boesenberg shined his flashlight towards the window to see if anyone was in this room." This appears to be inaccurate.

3

After observing the marijuana on the bed inside the house, Officer Garringer called his supervisor (Sergeant Nathan Juilfs) to the scene. It was decided that Juilfs and Officer Boesenberg would remain at the scene while Garringer obtained a search warrant. Defendant returned to the house before Garringer returned with the search warrant. While the search warrant was being executed — and after being *Mirandized* — Defendant made incriminating statements.

## III. DISCUSSION

Defendant concedes the officers were constitutionally permitted to walk up to her front door and conduct a "knock and talk."[5] Defendant also concedes that the search warrant was supported by probable cause and is not otherwise defective. Furthermore, Defendant does not claim her *Miranda* waiver was involuntary, or that the statements given by her after being *Mirandized* were otherwise involuntary. Rather, the sole issue raised in Defendant's motion is whether the observations made by the officers — which were used to provide probable cause for the issuance of a search warrant — were obtained in violation of the Fourth Amendment. Specifically, Defendant argues the officers were not permitted to leave the sidewalk and approach the window to view the interior of the house absent a warrant.

The Fourth Amendment, which protects against unreasonable searches, extends to the curtilage surrounding a home. *United States v. Weston*, 443 F.3d 661, 666 (8th Cir. 2006) (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)). The Government concedes in its resistance that the officers were standing within the protected curtilage of the home when looking through the window with a flashlight. The issue then becomes

---

[5] "A 'knock-and-talk' is an investigatory technique in which law enforcement officers approach the door of a dwelling seeking voluntary conversation and consent to search." *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1001 n.2 (8th Cir. 2010).

4

whether the officers conducted a search when looking through the window with a flashlight and, if so, whether the warrantless search violated the Fourth Amendment.

To support her claim that the use of a flashlight to search through the window of her darkened bedroom was violative of the Fourth Amendment, Defendant relies primarily on *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409 (2013). There, the Court considered "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a "search" within the meaning of the Fourth Amendment." *Id.* at 1413. Applying a "property rights" analysis, the Court concluded that an unlawful warrantless search occurred. *Id.* at 1417 ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.").

In reaching its conclusion, the *Jardines* Court noted that "when it comes to the Fourth Amendment, the home is first among equals." *Id.* at 1414. Moreover, the Court regards the area "immediately surrounding and associated with the home" — *i.e.*, the curtilage — as "part of the home itself for Fourth Amendment purposes." *Id.* The Court acknowledged that law enforcement officers need not "shield their eyes" when passing by the home on "public thoroughfares." However, when an officer leaves a public thoroughfare and enters the Fourth Amendment's protected areas, his authority to gather information is "sharply circumscribed." *Id.*

The Court recognized in *Jardines* that there is an "implicit license" which typically permits a visitor "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* Accordingly, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* at 1416 (quoting *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 1862 (2011)). In finding the officers violated the Fourth Amendment by taking a drug-sniffing dog up to the front door for the

purpose of detecting narcotics, the Court concluded the officers exceeded the scope of the implied license to approach the front door.

> But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marking his bloodhound into the garden before saying hello and asking permission, would inspire most of us to — well, call the police. *The scope of a license — express or implied — is limited not only to a particular area but also to a specific purpose.*

*Jardines*, 133 S. Ct. at 1416 (emphasis added). Accordingly, it was not necessary for the Court to decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz v. United States*, 389 U.S. 347 (1967). Instead, "[t]hat the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Id.* at 1417.

Obviously, this case does not involve a drug-sniffing dog. Defendant argues, however, that the principle established in *Jardines* — that investigating officers may not exceed the limits of an implied license when intruding on private property without a warrant — prohibits the officers in this case from leaving the sidewalk, approaching the window, and peering into the darkened room with a flashlight. The Government argues, on the other hand, that the officers' observations through the window did not constitute an unreasonable search under the Fourth Amendment.

In support of its argument, the Government cites *United States v. Weston*, 443 F.3d 661 (8th Cir. 2006). There, officers entered onto the curtilage of a home while investigating a report of stolen vehicles. The officers approached the front door to announce their presence, to inquire about the stolen vehicles, and to request consent to

6

search the remainder of the property. *Id.* at 667. The Court concluded the officers' entry onto the curtilage of the property was not violative of the Fourth Amendment. *Id.* ("Where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited."). "This tactic, commonly referred to as a 'knock and talk,' was a reasonable investigative technique under these circumstances." *Id.*

The facts in *Weston* are distinguishable, however, from the facts in this case. The officers in *Weston* did *not* deviate from the path which would typically be used to approach Weston's front door. That is, they complied with the "implied license" afforded to all visitors. As the officers approached the front door, they observed propane tanks in plain view which, because of discoloration, indicated they had contained anhydrous ammonia, an ingredient used in the manufacture of methamphetamine. Officers used this information to obtain a search warrant. That is, the incriminating evidence used to obtain a search warrant was in plain view of the officers while they were in a place authorized by a "knock-and-talk." In the instant action, the officers had a legitimate law enforcement objective in conducting a knock-and-talk. Specifically, they wanted to interview Alicea regarding the shooting 12 days earlier. However, the incriminating evidence was *not* in plain view as the officers approached the front door and knocked. Rather, the marijuana was not seen until Officer Boesenberg left the walkway, approached the window, and peered into the darkened room with a flashlight.

The Government also cites *United States v. Raines*, 243 F.3d 419 (8th Cir. 2001). In *Raines*, a sheriff's deputy went to the defendant's home, attempting to serve a civil process on an acquaintance of Raines. After receiving no response at the front door, but seeing several cars parked in the driveway, the deputy proceeded to the back of the house, where he observed a large number of marijuana plants in plain view. He then left the property and obtained a search warrant. Raines argued that the deputy's observation of

marijuana plants growing in plain view while standing within the curtilage of his home constituted a warrantless search in violation of the Fourth Amendment. In rejecting Raines' argument, the Court credited the officer's testimony that "because it was a pleasant summer evening, and several cars were parked in the driveway, he thought it likely the occupants were outside in the backyard." *Id.* at 421. The Court concluded the deputy "did not interfere with Raines's privacy interest when he, in good faith, went unimpeded to the back of Raines's home to contact the occupants of the residence."

Again, I believe the facts in *Raines* are distinguishable from those in the instant action. The Court in *Raines* concluded the deputy had a good faith belief that the occupants of the house could be found in the backyard because several cars were parked in the driveway and it was a pleasant summer evening. Here, it cannot be argued that Officer Boesenberg had a good faith belief that Alicea would be found in the darkened room. While there was apparently a light on somewhere in the house, the officers had not observed any vehicles, no one responded to Officer Garringer's knock, the officers did not observe any movement inside the house, and could not hear any sounds inside the house, other than dogs barking. Moreover, *Raines* was decided under a *Katz* privacy analysis and, obviously, did not address the property rights analysis recently described in *Jardines*. While there is an implied license permitting officers to approach the front door by the customary path and conduct a knock-and-talk, there is no implied license to step off the customary path, approach the windows to darkened rooms, and search the interior with a flashlight.

The Government also relies on *United States v. Anderson*, 552 F.2d 1296 (8th Cir. 1977), a case with similar facts. In *Anderson*, three federal agents walked to the front door of the home, intending to question the occupant about the theft of 242 color television sets. The agents rang the doorbell and knocked, but no one appeared. A light was visible inside the house and agents heard a dog barking *behind* the house. The agents walked

around the house "to determine if there was someone with the barking dog." As they walked along the side of the house, they noticed a lighted basement window partially covered by a shade. Looking through the window, they observed numerous unopened crates marked "Coronado Color Television." Using that observation, together with other information obtained in the investigation, the agents obtained a warrant to search the house.

Anderson argued that the agents' observations were made "while in a place where they had no right to be and, thus, was a warrantless search in violation of the Fourth Amendment." *Id.* at 1298. After reviewing the plain view doctrine, the Court stated that "the only question before us is whether the agents' presence in the backyard was an unlawful invasion of Wood's reasonable expectation of privacy so that any evidence observed was fruit of an illegal search." *Id.* at 1299 (citing *Katz v. United States*, 389 U.S. 347, 351-52 (1967)). In rejecting the defendant's motion to suppress, the Court noted that the agents' initial intrusion on the curtilage of the home was justified by their "legitimate objective of finding Wood to question him about the theft." Regarding the critical issue of whether the agents were then justified in walking around the house to determine if someone was with the barking dog, the Court's analysis is limited to a single sentence:

> We cannot say that the agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search.

*Anderson*, 552 F.2d at 1300.

Once again, I believe the facts in *Anderson* are distinguishable from those in this case. While Anderson contended that the agents' stated purpose in walking around the house was a mere pretext for their real objective of conducting an illegal search, the trial

court found that the agents walked around the house "solely to determine if someone was with the barking dog, and only inadvertently saw the stolen merchandise through the lighted basement window." *Id.*, fn.5. Like the deputy in *Raines*, the agents in *Anderson* reasonably believed that the purpose of their visit (locating an individual) could be accomplished by walking to the backyard. In *Raines*, the deputy reasonably believed that because it was a pleasant summer evening and several cars were parked in the driveway, it was likely the occupants were outside in the backyard. Similarly, the agents in *Anderson* believed that someone may be with the barking dog behind the house. In this case, there was no good reason for Officer Boesenberg to believe that Alicea was in the darkened room at the front of the house. The light in that room was not on at any time after the officers arrived, and there was no movement or sound coming from that room.

I believe the other cases cited by the Government in its resistance are equally unavailing. In *United States v. Robbins*, 682 F.3d 1111 (8th Cir. 2012), the Court found that officers did not violate the Fourth Amendment when they walked around the house looking in windows. In that case, however, the officers were responding to a 911 hang-up call, and — when they saw no persons, heard no unusual sounds, and observed no indication of a disturbance — reasonably believed that there may be someone in the house in need of assistance. In *United States v. Khabeer*, 410 F.3d 477 (8th Cir. 2005), there was no constitutional violation when an officer observed a television through the front window of a house *while standing in a driveway where he was entitled to be.*

In *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990), the Court found no constitutional violation when the officers walked around to the back after finding "the front door inaccessible, as it was five feet above ground and had no steps." "The legal question is whether the police had a right to be at the back of the house where they saw the gun, or whether they were simply snooping." *Id.*

> A policeman may lawfully go to a person's home to interview him. In doing so, he obviously can go up to the door, and, it seems to us, if that door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person.

*Daoust*, 916 F.2d at 758 (citations omitted). In this case, however, the front door was *not* inaccessible, and *Daoust* does not provide authority for the officers to look in a darkened room with a flashlight. *But see Nordskog v. Wainwright*, 546 F.2d 69, 71 (5th Cir. 1977) (finding no violation when officers followed footprints from a rape scene to the defendant's home and, after knocking on the front door and receiving no response, "peered" in a window of the residence).

The Government also cites *United States v. Hersh*, 464 F.2d 228 (9th Cir. 1972). There, deputies knocked on the front door of a house while investigating a report that a drug "laboratory" was being operated on the premises, but no one was home. "While standing on the front porch, they peered through a window which was only partially covered with a drape." *Id.* at 229. The defendant argued that when the deputies peered through the window of the house, it was an unlawful warrantless search. The Court rejected the defendant's argument, apparently adopting the government's position that "the deputies were in a place where they had a right to be, and that whatever they saw through the window was in *plain sight*, i.e., it was there to be seen, and was not therefore an improper search." *Id.* at 230. *If* the officers in the instant action had been able to see inside Alicea's bedroom from the front stoop or from the walkway — places where they were entitled to be — then this would be a different case. But they could not. Instead, it was necessary for Officer Boesenberg to leave the sidewalk, approach the house, and peer through the window into the darkened room using a flashlight.

While law enforcement officers may approach the front door of a residence in order to interview an occupant, they may not exceed the limits of an implied license when

11

intruding on private property without a warrant. That is, Officers Garringer and Boesenberg were legally entitled to walk up the driveway, over on the sidewalk, and up to the front door. When no one responded to Garringer's knock, however, there was no implied license to leave the path typically used to approach the front door, and search through windows of darkened rooms using a flashlight. Accordingly, I believe the observations made by the officers exceeded the scope of the implied license and were violative of the Fourth Amendment.

As a fall-back position, the Government argues the evidence need not be suppressed because the officers reasonably relied on binding circuit precedent, citing *United States v. Leon*, 468 U.S. 897 (1984), and *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011). In *Davis*, the Court reviewed the deterrent purpose of the exclusionary rule and concluded it does not apply to evidence obtained during a search conducted in reasonable reliance on binding precedent. 131 S. Ct. at 2429.

> [W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does no more than "act as a reasonable officer would and should act" under the circumstances.

*Davis*, 131 S. Ct. at 2429 (italics in original). The Government argues in this case that "officers have been authorized for decades to enter the curtilage in order to determine whether an individual is present in the home."[6]

The *Davis* exception to the exclusionary rule was very recently discussed by the Eighth Circuit Court of Appeals in *United States v. Burston*, ___ F.3d ___ (8th Cir. 2015) (decided November 23, 2015) (No. 14-3213). The Court found that a dog sniff

---

[6] Government's Resistance (docket number 20) at 10.

within six to ten inches of the defendant's window was a violation of the defendant's Fourth Amendment rights. While the search in *Burston* involved a dog sniff, the Court noted that "[e]ven absent the intent to search, police officers would not have an implicit license to stand six to ten inches from the window in front of Burston's apartment," citing *Jardines*. *Id.* at 7. Because the police officers had no license to invade Burston's curtilage, the Court concluded that the search was in violation of Burston's Fourth Amendment rights under *Jardines*. *Id.*

The *Burston* Court then turned to the government's argument that "the exclusionary rule does not apply because the officers acted in objectively reasonable reliance on binding Eighth Circuit precedent in conducting the dog sniff, as required by the *Davis* exception, and the officers executed the search in good faith under *Leon*." *Id.* at 7-8. The Court rejected the government's argument. The Court concluded that the cases upon which the government relied were factually distinguishable from those in *Burston* and, therefore, the officer's reliance on those cases was "misplaced and not objectively reasonable." *Id.* at 9. Similarly, as discussed in more detail above, I believe the cases cited by the Government as binding precedent in this case are distinguishable on their facts.

Most important, however, is the fact that *Jardines* was decided *before* the officers searched the house on January 15, 2015. That is, *Jardines* was the binding appellate precedent at the time of these events. Even *if* prior Eighth Circuit precedent would have permitted the search conducted by the officers in this case, *Jardines* held that investigating officers may not exceed the limits of an implied license when intruding on private property without a warrant. Because there was "binding appellate precedent" which prohibited the officers' search in this case, *Davis* provides no safe harbor.

The *Burston* Court also concluded in a footnote that the good faith exception to the exclusionary rule articulated in *Leon* was also inapplicable. "The officers' reliance on the search warrant could not be deemed objectively reasonable because the same officers'

13

prewarrant conduct was not 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *Burston*, at 9, fn. 8. I reach the same conclusion here. Moreover, it should be recalled that in issuing the search warrant, the judicial magistrate presumably relied on Officer Garringer's statement that Officer Boesenberg made his observations "while standing by the door." That wasn't true. The *Leon* good faith exception does not apply "when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007).

In summary, as Defendant concedes, Officers Garringer and Boesenberg were authorized "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 133 S. Ct. at 1414. However, investigating officers may not exceed the limits of an implied license when intruding on private property without a warrant. Accordingly, when the officers received no response to Garringer's knock, they were not permitted to leave the sidewalk, approach the window, and peer into the darkened room with a flashlight. *Jardines* was decided in March 2013, nearly two years prior to the search in this case. Therefore, it constituted the binding appellate precedent, and the Government's reliance on *Davis* is misplaced. Similarly, *Leon* will not save the search here. Accordingly, evidence seized during the execution of the search warrant obtained as a result of the unlawful warrantless search, and Alicea's statements made while the search was executed, must be suppressed.

## IV. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the Motion to Suppress (docket number 17) filed by the Defendant be **GRANTED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file

written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on November 13, 2015.*

DATED this 24th day of November, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA